IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| Timothy Leon Woodby, | ) | C/A No.: 1:14-952-RMG-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

I.    Relevant Background

A.    Procedural History

On February 3, 2011, Plaintiff filed applications for DIB and SSI in which he alleged his disability began on June 15, 2004. Tr. at 74, 76, 157–63, 164–71. His

applications were denied initially and upon reconsideration. Tr. at 81–82, 85–86, 94, 96. On September 6, 2012, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Ronald Fleming. Tr. at 28–72 (Hr'g Tr.). The ALJ issued a partially-favorable decision on September 26, 2012, finding that Plaintiff was not disabled before his date last insured ("DLI") of December 31, 2006, but that he became disabled on June 27, 2011. Tr. at 9–23. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–3. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on March 17, 2014. [ECF No. 1].

B.      Plaintiff's Background and Medical History

1.      Background

Plaintiff was 54 years old at the time of the hearing. Tr. at 35. He completed the ninth grade. Tr. at 37. His past relevant work ("PRW") was as a pipe insulator. Tr. at 61. He amended his alleged onset date during the hearing and alleges he has been unable to work since October 1, 2006. Tr. at 34, 37.

2.      Medical History

a.      Before DLI

On February 25, 2005, Plaintiff presented to Marolyn Baril, APRN ("Ms. Baril"), at Margaret J. Weston Community Health Center ("MJWCHC") for elbow pain and prescription refills. Tr. at 304. He indicated that his elbow pain was a chronic problem, but had worsened three to four days earlier. *Id.* Ms. Baril observed large, hot, reddened

epicondyle edema in Plaintiff's bilateral elbows. *Id.* She assessed hypertension, gouty arthritis, and epicondylitis and prescribed Allopurinol and Colchicine. *Id.*

Plaintiff followed up with Ms. Baril for medication changes and refills on May 6, 2005. Tr. at 303. Ms. Baril noted that both of Plaintiff's elbows had tophaceous deposits and that his left big toe was inflamed, red, and painful. *Id.* She assessed chronic gouty arthritis and hypertension and prescribed Lotrel, Colchicine, and Allopurinol. *Id.*

On January 3, 2006, Plaintiff presented to the Medical University of South Carolina ("MUSC"), complaining of severe knee pain and swelling that had lasted for weeks. Tr. at 393. He indicated that he had taken Allopurinol and Colchicine, but had obtained no relief. *Id.* Plaintiff had swelling and decreased sensation in his left knee. Tr. at 388. He was diagnosed with gout and prescribed Prednisone. Tr. at 391, 392. An x-ray of his left knee indicated a small suprapatellar spur and unicompartment osteoarthritic change. Tr. at 395.

On December 6, 2006, Plaintiff presented to MJWCHC complaining of gout in both of his legs. Tr. at 302. He indicated his right foot was very painful and was causing him trouble when he walked. *Id.* Plaintiff reported that he had been managing his pain by taking his brother's medications, but that his brother died. *Id.* The provider observed Plaintiff to have "large deposits" in both elbows, inflammation in multiple joints, tenderness in his right great toe and ankle, severe tenderness in his bilateral elbows and knees, and 2–3+ edema in his knees, ankles, and feet. *Id.* The provider diagnosed gouty arthritis and hypertension, refilled Colchicine, prescribed a Medrol dose pack and Darvocet, and administered an injection of DepoMedrol and Toradol. *Id.*

3

b.      After DLI

On March 13, 2007, Plaintiff presented to MJWCHC complaining of a gout flare in his right foot. Tr. at 301. The provider assessed an acute gout flare and prescribed medications. *Id.*

Plaintiff presented to the emergency department at Aiken Regional Medical Center ("ARMC") on March 21, 2007, complaining of fever and redness to his right foot that had been ongoing for one week. Tr. at 261. A review of symptoms was normal, with the exception of Plaintiff's right lower extremity. *Id.* An x-ray of his right foot revealed gouty arthritis involving the first metatarsophalangeal joint and the fifth metatarsophalangeal joint to a lesser extent. Tr. at 263. It also indicated moderately severe osteoarthritic chances of the tarsus. *Id.* Plaintiff was diagnosed with cellulitis of the right foot. Tr. at 261. Plaintiff followed up at ARMC on March 23, 2007. Tr. at 257. He had significant erythema in his right foot, which was painful to palpation. *Id.* When Plaintiff followed up two days later, the cellulitis was "resolving," and he had significantly less erythema. Tr. at 254.

On May 8, 2007, Plaintiff presented to ARMC complaining of elbow pain and fever. Tr. at 247. Abnormalities were noted in his left upper extremity, but the examination was otherwise normal. *Id.* Plaintiff was diagnosed with acute left elbow pain and gout. *Id.*

Plaintiff followed up with MJWCHC for medication refills and a blood pressure check on February 18, 2008. Tr. at 300. He reported gout flares every few months. *Id.* Abnormalities were noted in Plaintiff's bilateral elbows and in the interphalangeal joint

4

of his right middle finger. *Id.* The provider assessed gout and advised Plaintiff to stop smoking. *Id.*

On February 26, 2008, Plaintiff followed up with MJWCHC and reported that his knee pain was not relieved by the prescribed medications. Tr. at 299. The provider observed no crepitus, warmth, or erythema, but noted some swelling on the medial aspect of Plaintiff's right knee. *Id.* The provider prescribed Naproxen and Darvocet N100, administered an injection of DepoMedrol and Toradol, and diagnosed bursitis. *Id.*

Plaintiff followed up with MJWCHC on April 7, 2008. Tr. at 298. He reported his knee pain improved with medication. *Id.* The provider noted no crepitus, warmth, or erythema. The provider continued Plaintiff's medications, increased his Lisinopril dosage, and added prescriptions for Norvasc 10 mg and Chantix. *Id.*

On June 18, 2008, Plaintiff followed up with MJWCHC for left hip pain, knee swelling, and shoulder pain. Tr. at 297. The provider administered trigger point injections and refilled Plaintiff's medications. *Id.*

Plaintiff presented to MJWCHC for follow up and medication refills on March 19, 2009. Tr. at 296. He stated that he had been out of medications for a month, but had borrowed some from his sister. *Id.* He complained of pain in his shoulder and hip that was worse on the right than on the left. *Id.* The provider refilled Plaintiff's medications, prescribed Darvocet N100, and administered trigger point injections. *Id.*

On June 9, 2009, Plaintiff followed up with MJWCHC for medication refills and pain in his right arm, elbow, shoulder, and neck. Tr. at 294. He rated his right shoulder and elbow pain as 10 out of 10. *Id.* The provider observed Plaintiff to have muscle

spasms, prescribed Clonidine and a topical cream, and administered trigger point injections. *Id.*

Plaintiff presented to Lexington Medical Center ("LMC") Urgent Care on August 10, 2009, complaining of shortness of breath and pleuritic right chest pain. Tr. at 272–73. A CT was ordered to rule out pulmonary embolus. Tr. at 273. The CT indicated no evidence of pulmonary embolus, aneurysm, or dissection, but revealed pulmonary nodules. Tr. at 268. A chest x-ray was normal. Tr. at 270. An EKG indicated sinus tachycardia, possible left atrial abnormality, left axis deviation, and septal ST elevation. Tr. at 274. Plaintiff was diagnosed with acute bronchospasm, bronchitis, chest pain, and pulmonary nodules. Tr. at 273. The physician prescribed Albuterol, Amoxil 1 gm, Lortab 5 mg, and a four-day taper of Prednisone, instructed Plaintiff to use the Albuterol in a nebulizer machine every four hours, and directed him to stop smoking. *Id.* The provider also instructed Plaintiff to obtain a follow-up chest CT in two months to determine the stability of the nodules observed on the CT scan. *Id.*

Plaintiff presented to MJWCHC for prescription refills on September 3, 2009. Tr. at 293. S. Grace, L.P.N., assessed hypertension and low back pain. *Id.*

Plaintiff followed up at MJWCHC for left shoulder and ankle pain on October 22, 2009. Tr. at 292. The provider assessed shoulder pain, leg/ankle pain, and muscle spasm and prescribed Lortab 5/500 mg. *Id.*

On August 19, 2010, Plaintiff presented to MJWCHC for follow up for hypertension and gout and for medication refills. Tr. at 279–82. Plaintiff reported a gout flare and indicated he had been "bedridden for days." Tr. at 279. A review of systems

6

indicated arthralgias, swelling, and joint stiffness localized to one or more joints, but no soft tissue swelling. Tr. at 280. Erin Beaudry, APRN ("Ms. Beaudry"), observed swollen joints in Plaintiff's right middle finger, right knee, right elbow, and left foot. Tr. at 280. She noted limited and antalgic range of motion in the affected joints. *Id.* She refilled Plaintiff's medications for hypertension and gout. *Id.*

Plaintiff presented to Ms. Beaudry on June 7, 2011, complaining of nausea and stomach pain and requesting medication refills. Tr. at 283. Ms. Beaudry refilled Plaintiff's medications and ordered laboratory testing that revealed an elevated serum LDH level. Tr. at 283, 284–85.

On June 27, 2011, Plaintiff presented to Vasant L. Garde, M.D., for a comprehensive orthopedic examination at the direction of the disability examiner. Tr. at 309–15. Plaintiff complained of hypertension, breathing trouble, and pain in his knees, ankles, right hip, and bilateral wrists and elbows. Tr. at 309. He complained of gout and arthritis in most of his joints. *Id.* He stated the joints on his right side were more painful than those on his left side. Tr. at 310. Dr. Garde observed that Plaintiff walked with a right-sided limp and used a cane. Tr. at 311. Plaintiff had swelling over both olecranon areas and the proximal interphalangeal joints of the right third finger. *Id.* He had limited range of motion of the cervical spine, right shoulder, right knee, right wrist, and right hip. *Id.* He had limited dorsiflexion in his bilateral ankles. *Id.* Plaintiff's grip strength was 5/5 in his left hand, and Dr. Garde indicated Plaintiff's ability to carry out fine and gross manipulation with the left hand did not seem compromised. *Id.* However, Plaintiff had 3–

4/5 grip strength on the right side, and Dr. Garde noted "his ability to carryout fine and gross manipulation seem[s] somewhat compromised because of discomfort." Tr. at 312.

State agency medical consultant William Lindler, M.D., completed a physical residual functional capacity assessment on July 1, 2011, in which he indicated Plaintiff was limited as follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk about six hours in an eight-hour workday; sit about six hours in an eight-hour workday; occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl; never climb ladders/ropes/scaffolds; occasionally reach overhead; frequently handle and finger with the right hand; and avoid concentrated exposure to extreme cold, extreme heat, humidity, fumes, odors, dusts, gases, poor ventilation, and hazards. Tr. at 319–26. Dr. Lindler indicated that there was insufficient evidence to assessment Plaintiff's RFC prior to his DLI due to a lack of medical evidence. Tr. at 324.

Plaintiff followed up with Ms. Beaudry for right knee and hip pain on September 7, 2011. Tr. at 344. Ms. Beaudry assessed hypertension, gout, and wheezing. Tr. at 341. She refilled Plaintiff's existing prescriptions and prescribed Albuterol. *Id.* Plaintiff requested that she prescribe a Canadian crutch, but she indicated that she needed to determine the criteria for use and discuss it further at his follow up visit. *Id.*

On September 26, 2011, state agency medical consultant James Haynes, M.D., completed a physical residual functional capacity assessment, in which he indicated Plaintiff was limited as follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk about six hours in an eight-hour workday; sit

about six hours in an eight-hour workday; occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl; never climb ladders/ropes/scaffolds; occasionally reach overhead; frequently handle and finger with the right hand; and avoid concentrated exposure to extreme cold, extreme heat, humidity, fumes, odors, dusts, gases, poor ventilation, and hazards. Tr. at 327–34. Dr. Haynes also indicated that there was insufficient medical evidence to assess Plaintiff's residual functional capacity prior to his DLI. Tr. at 332.

On November 11, 2011, Plaintiff was examined by John H. Polak, D.O. ("Dr. Polak"). Tr. at 352–54. Dr. Polak indicated that Plaintiff's prior screening exam identified obesity, bilateral large bunions, elevated blood pressure and cholesterol, and hearing loss. Tr. at 352. Dr. Polak observed Plaintiff to be overweight. *Id.* He observed Plaintiff to have bilateral large bunions, decreased range of motion in his left shoulder, and swelling and tenderness in his bilateral ankles, right knee, and right wrist. *Id.* Plaintiff's blood pressure was elevated at 164/89. *Id.* Plaintiff's glucose, hemoglobin A1c, total cholesterol, kidney and liver function, and other blood tests were normal. Tr. at 352–53. Plaintiff's breathing test showed obstructive lung disease. Tr. at 353. His chest x-ray was normal. *Id.* An x-ray of his spine indicated some degenerative changes. *Id.* Plaintiff was encouraged to stop smoking and to follow up with his doctor for cancer screenings because of possible radiation exposure through his past work. Tr. at 353–54.

On November 15, 2011, Plaintiff complained to Ms. Beaudry of left shoulder pain. Tr. at 345. Ms. Beaudry noted abnormalities in Plaintiff's shoulder that included tenderness on palpation of the acromioclavicular joint, painful active range of motion,

and positive Hawkins, crossover, and NEER signs. *Id.* Ms. Beaudry prescribed a Canadian crutch and indicated that the pain in Plaintiff's left shoulder was likely coming from his rotator cuff. Tr. at 343, 410.

On April 26, 2012, Plaintiff presented to the emergency department at LMC complaining of chest pain radiating to his left arm. Tr. at 355. An EKG revealed an inferior wall ST elevation myocardial infarction. Tr. at 363. Plaintiff underwent a cardiac catheterization that revealed coronary artery disease and required stent placement in his proximal right coronary artery. Tr. at 371–72. M. Chris Marshall, M.D., diagnosed probable significant chronic obstructive pulmonary disease ("COPD"), prescribed bronchodilators and a short course of steroids, and scheduled pulmonary function tests. Tr. at 368–69. Pulmonary function tests on April 30, 2012, indicated obstructive lung disease and asthma/hyper-reactive airway disease. Tr. at 374. A chest x-ray indicated two of the lung nodules observed in 2009 were stable and the other was reduced in size. Tr. at 376. Plaintiff was released from LMC on May 1, 2012. Tr. at 377.

Plaintiff followed up with Matthew T. Haigh, ACNP-BC ("Mr. Haigh"), at Carolina Pulmonary and Critical Care on July 5, 2012. Tr. at 413–413. Mr. Haigh provided impressions of unspecified asthma with acute exacerbation, hypertension, probable hypocholesterolemia, gout, tobacco abuse, and coronary artery disease, status post-stenting to the right coronary artery. Tr. at 414. He increased Plaintiff's dosage of Symbicort and prescribed a Prednisone taper, Albuterol, and Ventolin. *Id.*

Later that day, Plaintiff presented to the emergency department at LMC, complaining of pain in his right knee, middle finger, and elbow. Tr. at 383. An x-ray of

Plaintiff's right knee indicated a small suprapatellar knee effusion. Tr. at 378. Plaintiff was diagnosed with knee pain, gouty arthritis, and knee effusion and prescribed Prednisone and Vicodin. Tr. at 381.

On August 14, 2012, Plaintiff presented to Mackie J. Walker, D.P.M., for an evaluation. Tr. at 396–98. Plaintiff complained of burning and numbness in his feet and pain in his bilateral feet, right shoulder, right elbow, bilateral hands, and back. Tr. at 396. He reported gout, COPD, hypertension, asthma, and cardiovascular disease. *Id.* Plaintiff stated he had been using a cane for ten years because of his severe gout and indicated he sometimes used a walker or wheelchair. *Id.* Dr. Walker noted that Plaintiff's blood pressure was elevated at 155/95. *Id.* He observed below-average temperature and sparse hair distribution on Plaintiff's skin. *Id.* His dorsalis pedis pulse and posterior tibial pulses were weakened and his capillary refill was prolonged. *Id.* He had forefoot edema. *Id.* His sensorium was diminished on sharp, dull, and light touch. *Id.* His muscle strength was 4/5 for inverters, dorsiflexors, and plantar flexors. *Id.* He had significantly limited range of motion of his ankle subtalar and midtarsal joints and at the first metatarsophalangeal joint bilaterally. *Id.* He demonstrated limited motion of the right wrist, elbow, and shoulder. *Id.* His gait was antalgic. *Id.* He had severe hallux valgus (bunion) deformity with obvious changes throughout his body due to tophaceous gout. *Id.* Gouty changes were severe at the first metatarsophalangeal joint in both feet, but also present through the mid-tarsus and ankles. Tr. at 397. He had significant gouty changes of the olecranon bursa, right elbow, and right knee. *Id.* Dr. Walker then noted the following, which appears to be inconsistent with many of the examination findings indicated above:

> Normal nails. No skin lesions noted. Adequate pedal pulses and capillary return. No varicosities or edema. No sign of lymphadenopathy. DTR's are present and symmetrical. Sensorium intact. Babinski and clonus are negative. Negative Tinel's sign. Muscle strength is 5/5 for invertors, evertors, dorsiflexors and plantar flexors. Equal in tone and tension bilaterally. Good range of motion of the ankle subtalar and midtarsal joints. Mallcoli are parallel. Posture normal.

*Id.* He assessed severe tophaceous gout with limitation of motion and pain in joints, hypertension, hyperlipidemia, and heart disease. *Id.* Dr. Walker indicated Plaintiff "presents a classic presentation of someone who is ravaged by gout and totally incapacitated as a result of the disease." *Id.* Dr. Walker also completed a physical capacities evaluation form in which he indicated Plaintiff was limited as follows: sit for two hours at a time and for two hours in an eight-hour workday; stand for one hour at a time and for one hour in an eight-hour workday; walk for one hour at a time and for one hour in an eight-hour workday; never lift any weight; never push or pull any weight; never stoop (bend), kneel, crouch, twist, or climb stairs; needs a job that permits shifting positions at will from sitting, standing, or walking; needs to shift positions every 30 minutes; never reaching above shoulder, handling, or fingering; occasionally reaching at or below waist-level and feeling; and unable to repetitively use bilateral feet and right hand. Tr. at 399–400. He indicated Plaintiff should elevate his legs at hip height while sitting for prolonged periods. Tr. at 400. He indicated Plaintiff must use an assistive device while engaging in occasional standing/walking and noted he had used a cane since 2002. *Id.* Dr. Walker wrote that the limitations/restrictions began "10+ years ago (2001)." *Id.* He stated his opinion was supported by "severe tophaceous gout of both extremities with progressive deformities." *Id.*

C.      The Administrative Proceedings

1.      The Administrative Hearing

a.      Plaintiff's Testimony

At the hearing on September 6, 2012, Plaintiff testified he was right-handed. Tr. at 35. He stated he lived in a small house with his brother who paid the utility bills. Tr. at 35–36. He indicated his sister also supported him financially. Tr. at 36.

Plaintiff testified that he moved to South Carolina in 2002 to be closer to his mother, but was unable to obtain work because his knee pain prevented him from standing for eight hours. *Id.* He stated he had not worked anywhere since October 1, 2006. Tr. at 37.

Plaintiff testified that he had experienced constant problems with gout over the prior 10-year period. Tr. at 37. He indicated that his gout affected nearly all his joints and prevented him from standing for long periods and riding long distances. Tr. at 38. He rated his pain as ranging from a three to a 10 out of 10 and indicated that it reached a 10 out of 10 "at least three or four times a month." Tr. at 39. He testified that he stayed in bed on the days in which his pain was a 10 out of 10. *Id.* Plaintiff testified that he used a wheelchair and a walker to ambulate when his gout flared. Tr. at 53. He stated he experienced stiffness after riding and needed to elevate his knee "all the time." Tr. at 38. He testified that he was unable to push a sweeper because of right elbow pain. *Id.* He indicated he had been told he needed several surgeries. *Id.*

Plaintiff testified that he also had arthritis in his hands, knees, ankles, and wrist. Tr. at 40. He rated the pain in his hands as a five or six out of 10. Tr. at 41. He stated the

13

arthritis in his hands caused difficulty lifting and pushing and pulling a lawnmower. *Id.* He stated that he also had difficulty lifting because of elbow pain and weakness. Tr. at 44. Plaintiff testified that his right hip pain affected his abilities to walk, sit, and climb stairs. *Id.* He rated his right hip pain as a five or six out of 10. Tr. at 45. He indicated he also experienced weakness in his knee. *Id.* He stated right shoulder pain was most bothersome when he had to push a lot with his cane while walking, but generally ranged from a three to five out of 10. *Id.* Plaintiff denied neck pain, but stated he experienced daily pain between his shoulder blades that was worse on the right than on the left. Tr. at 45–46. Plaintiff denied heart problems, but acknowledged occasional chest pain and stated he had taken nitroglycerin approximately three times since his heart stent procedure. Tr. at 46.

Plaintiff testified that he used a nebulizer four times daily and had been using the nebulizer for "probably five years." Tr. at 43. He stated that he began using two inhalers in either April or May of 2012. *Id.* He indicated he was on Ventolin for three years, but that his doctor had recently prescribed another medication. *Id.* Plaintiff denied using oxygen. *Id.* He denied going to the hospital for an asthma attack within the prior year. Tr. at 47. He testified that he stopped smoking approximately five months prior to the hearing. Tr. at 42. He indicated that dust and pollen exacerbated his breathing problems. Tr. at 57.

Plaintiff testified that he could sit for an hour in a comfortable chair. *Id.* He indicated he could stand for 15 minutes. *Id.* He stated he could walk for five minutes at a time. *Id.* He initially testified that he could lift "a very small child," but he stated that he

14

had difficulty lifting a gallon of milk with his right hand. Tr. at 47–48. Plaintiff indicated he would have difficulty getting on his knees to kneel, crouch, or crawl. Tr. at 48. He testified that he could no longer hold a pen for a long period or play the guitar because of arthritis and gout in his hands. Tr. at 54.

Plaintiff testified that he had a driver's license and drove approximately every two days. Tr. at 36–37. He indicated he drove to the hearing. Tr. at 37. He stated that he cooked meals, which he enjoyed doing, but that his brother washed the dishes. Tr. at 48. Plaintiff indicated he did not vacuum, mop, or sweep. *Id.* He stated that he did small loads of laundry. *Id.* He testified he had not recently been shopping for groceries. *Id.* He stated that he performed self-care tasks on his own. Tr. at 49. Plaintiff stated he rarely attended church, visited family and friends, or went out to eat. *Id.* He indicated he spent more than half of a typical day lying down. Tr. at 55.

Plaintiff testified that his current limitations were "about the same" as his restrictions in 2006. Tr. at 50. He indicated he had problems with his wrist and knee since he injured them in 1998. *Id.* He stated he moved back to South Carolina in 2002 because he was unable to perform his job. *Id.* Plaintiff testified that he was hospitalized in 2006 for gout in his knee. Tr. at 51. He indicated he had problems with gout and arthritis in his foot before 2007 and had been using a cane for seven or eight years. Tr. at 52. He testified that he occasionally had to use a walker in 2006. Tr. at 53.

b.    Vocational Expert Testimony

Vocational Expert ("VE") Clarence Hulett reviewed the record and testified at the hearing. Tr. at 63–71. The VE categorized Plaintiff's PRW as a pipe layer/pipe fitter

*Dictionary of Occupational Titles* ("*DOT*") number 862.361-014, as medium with a SVP of 7. Tr. at 64. The ALJ described a hypothetical individual of Plaintiff's vocational profile who was limited to light work with occasional climbing of ramps and stairs; no climbing of ladders, ropes, or scaffolds; occasional balancing and stooping; no kneeling, crouching, or crawling; occasional overhead reaching bilaterally; frequent handling and fingering with the right upper extremity. Tr. at 64. He asked the VE to further assume that the individual would need to avoid concentrated exposure to extreme heat, cold, humidity, fumes, odors, dusts, gases, poor ventilation, machinery, and heights. *Id.* The VE testified that the hypothetical individual could not perform any of Plaintiff's past relevant work. *Id.* The ALJ asked whether there were any other jobs in the region or national economy that the hypothetical person could perform. *Id.* The VE identified light and unskilled jobs as a photocopy machine operator, *DOT* number 207.605-014, with 165,000 in the national economy and 1,000 jobs in the state economy; a "[inaudible] waiter,"[1] *DOT* number 222.387-074, with 155,000 jobs in the national economy and 1,850 jobs in the state economy; and a mail clerk, *DOT* number 209.687-026, with 211,000 jobs in the national economy and 3,640 jobs in the state economy. Tr. at 64–65. The ALJ next asked the VE to assume the same limitations as indicated in the first hypothetical, but to further assume that the individual was limited to sedentary work. Tr. at 65. He asked if there would be other work that the individual could perform. *Id.* The VE testified that the individual could perform sedentary unskilled jobs as a sorter, *DOT* number 521.687-086, with 135,000 jobs in the national economy and 1,500 in the state

---

[1] This *DOT* number is consistent with the job of shipping-and-receiving weigher.

economy; a "[inaudible] clerk,"[2] *DOT* number 209.567-014, with 185,000 jobs in the national economy and 2,000 jobs in the state economy; and a charge account clerk, *DOT* number 205.367-014, with 180,000 jobs in the national economy and 1,850 jobs in the state economy. The ALJ then asked the VE to assume the same limitations indicated in the second hypothetical, but to also assume that "due to symptomology the hypothetical individual would be off task 20 percent of the workday." Tr. at 65–66. The ALJ asked the VE if there would be work that the hypothetical individual could perform. Tr. at 66. The VE testified that there would be no jobs because of the "time off task." *Id.*

Plaintiff's attorney asked the VE if the jobs cited at the light and unskilled sedentary level generally required good use of the bilateral hands. *Id.* He then restated the question to ask if they required more than occasional use of the hands. *Id.* The VE testified that all of the jobs required frequent handling and fingering. Tr. at 67. Plaintiff's attorney next asked the VE how often an individual could be absent from work in a typical month in the types of jobs identified. *Id.* The VE testified that employers generally tolerated no more than two absences per month. *Id.* Plaintiff's attorney asked the VE if the jobs identified at the light exertional level required both standing up to six hours a day and lifting up to 20 pounds. Tr. at 68–69. The VE confirmed that they did. Tr. at 69. Plaintiff's attorney asked if an individual could perform those jobs if he were required to use a cane for standing or walking. *Id.* The VE testified that use of a cane for standing and walking would affect an individual's ability to perform the jobs identified at the light exertional level. Tr. at 70.

---

[2] This *DOT* number is consistent with the job of order clerk, food and beverage.

2.    The ALJ's Findings

In his decision dated September 26, 2012, the ALJ made the following findings of

fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2006.
2.    The claimant has not engaged in substantial gainful activity since the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
3.    Since the amended alleged onset date of disability, October 1, 2006, the claimant has had the following severe impairments: Gout; Chronic Obstructive Pulmonary Disease (COPD); Arthritis; Degenerative joint disease of the right hip; Degenerative joint disease of the right shoulder; Degenerative disc disease of the cervical spine; and, Status post coronary stent placement secondary to coronary artery disease (20 CFR 404.1520(c) and 416.920(c)).
4.    Since the amended alleged onset date of disability, October 1, 2006, the claimant has not had an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
5.    After careful consideration of the entire record, the undersigned finds that prior to June 27, 2011, the date the claimant became disabled, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) with only occasional climbing of ramps and stairs; no climbing of ladders[,] ropes or scaffolds; occasional balancing, stooping; no kneeling[,] crouching or crawling; occasional overhead reaching bilaterally; frequent handling and fingering with the right upper extremity; and, the need to avoid concentrated exposure to extreme, heat, cold, humidity, flumes [sic], odors, dusts, gases, poor ventilation, and machinery and heights.
6.    After careful consideration of the entire record, the undersigned finds that beginning on June 27, 2011, the claimant has the residual functional capacity to perform no more than sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) with only occasional climbing or ramps and stairs; no climbing of ladders, ropes or scaffolds; occasional balancing, stooping; no kneeling[,] crouching or crawling; occasional overhead reaching bilaterally; and frequent handling and fingering with the right upper extremity. The claimant must avoid concentrated exposure to extreme, heat, cold, humidity, flumes [sic], odors, dusts, gases, poor ventilation, and machinery and heights.

18

7.  Since June 15, 2004, the claimant has been unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

8.  Prior to the established disability onset date, the claimant was an individual closely approaching advanced age. The claimant's age category has not changed since the established disability onset date (20 CFR 404.1563 and 416.963).

9.  The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

10. Prior to June 27, 2011, transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled" whether or not the claimant has transferable skills. Beginning on June 27, 2011, the claimant has not been able to transfer job skills to other occupations (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

11. Prior to June 27, 2011, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

12. Beginning on June 27, 2011, considering the claimant's age, education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

13. The claimant was not disabled prior to June 27, 2011, but became disabled on that date and has continued to be disabled through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

14. The claimant was not under a disability within the meaning of the Social Security Act at any time through December 31, 2006, the date last insured (20 CFR 404.315(a) and 404.320(b)).

Tr. at 15–22.

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)  the ALJ failed to assess the onset date of disability based on the provisions of SSR 83-20; and

2)  the ALJ did not properly assess Plaintiff's credibility.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.     Legal Framework

1.     The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[3] (4) whether such

---

[3] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen*

impairment prevents claimant from performing PRW;[4] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v.*

---

*v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[4] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

*Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*; *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is

substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    Onset Date of Disability

Plaintiff argues that the ALJ failed to properly assess his onset date based on the requirements set forth in SSR 83-20. [ECF No. 20 at 18]. He submits that his application for DIB should not have been denied merely because the majority of the medical evidence pertained to the period after his DLI. *Id.* at 19. He also argues that the ALJ did not properly consider Dr. Walker's opinion that related back to the period prior to his DLI. *Id.* at 20–22. Plaintiff maintains that the ALJ was required to consult a medical expert to determine the onset date of his disabling condition. *Id.* at 22–24.

The Commissioner argues that the ALJ reasonably determined Plaintiff's disability onset date. [ECF No. 22 at 11]. She contends the ALJ's statement that Dr. Walker's evaluation did not relate back to any period prior to Plaintiff's DLI was harmless error. *Id.* at 15. The Commissioner maintains the ALJ was not required to obtain the testimony of a medical expert because the ALJ had unambiguous evidence to indicate Plaintiff was not disabled prior to June 27, 2011. *Id.* at 12.

Where a claimant alleges a disabling condition of non-traumatic origin, the ALJ should consider the following factors in determining the claimant's onset date: the claimant's statements as to when the disability began; the day the impairment caused the claimant to stop work; and medical reports containing descriptions of the claimant's

23

examinations or treatment, including reports from all medical sources that bear upon the onset date. SSR 83-20.

"Medical evaluations made after a claimant's insured status has expired are not automatically barred from consideration and may be relevant to prove a disability arising before the claimant's DLI." *Bird v. Commissioner*, 699 F.3d 337, 340 (4th Cir. 2012) *citing Wooldridge v. Bowen*, 816 F.2d 157, 160 (4th Cir., 1987). "[P]ost-DLI medical evidence generally is admissible in an SSA disability determination in such instances in which that evidence permits an inference of linkage with the claimant's pre-DLI condition" and "retrospective consideration of evidence is appropriate when 'the record is not so persuasive as to rule out any linkage' of the final condition of the claimant with his earlier symptoms." *Bird*, 699 F.3d at 341, *citing Moore v. Finch*, 418 F.2d 1224, 1226 (4th Cir. 1969); *see also Johnson v. Barnhardt*, 434 F.3d 650 (4th Cir. 2005).

The onset date alleged by the claimant should be used if it is consistent with all the available evidence. SSR 83-20. However, additional evidence may be needed to reconcile discrepancies when the medical or work evidence is inconsistent with the onset date alleged by the claimant. *Id.* It may be necessary for an ALJ to call on the services of a medical advisor when an informed judgment of the facts is necessary to determine when the claimant's impairment or combination of impairments reached a disabling level of severity. *Id.* In *Bailey v. Chater*, 68 F.3d 75, 79 (4th Cir. 1995), court held that "[i]n the absence of clear evidence documenting the progression of [the claimant's] condition, the ALJ did not have the discretion to forgo consultation with a medical advisor." The court further stated "[t]he requirement that, in all but the most plain cases, a medical advisor be

consulted prior to inferring an onset date is merely a variation on the most pervasive theme in administrative law—that substantial evidence support an agency's decision." *Id.* at 80.

The ALJ found that Plaintiff became disabled on June 27, 2011, because "the first evidence of significant functional limitations" was "not apparent until the consultative examination" on that date. Tr. at 20. He noted that Plaintiff had only visited a physician for gout on six occasions between 2001 and the end of 2006, and that the treatment notes from those visits did not "establish a level of treatment, let alone any functional evidence, that could be considered disabling." *Id.* He also noted that Plaintiff obtained more frequent treatment beginning in 2008 and that his doctor prescribed a crutch in November 2011. *Id.*

The ALJ indicated he considered Dr. Walker's opinion, but that it did not "relate back to any period prior to the expiration of the insured status in December 2006." *Id.* Therefore, he concluded that there was "no significant evidentiary weight given to that opinion for the period prior to December 2006." *Id.*

The undersigned recommends a finding that the ALJ erred in failing to give retroactive consideration to Dr. Walker's opinion and further recommends that the court reject the Commissioner's argument that this was harmless error. The ALJ was required to consider Plaintiff's statements about when his disability began, evidence of when he stopped work, and the medical record. *See* SSR 83-20. In considering the medical record, SSR 83-20 specifies that the ALJ should consider reports from medical providers that bear upon the onset date. Using rationale similar to that used by the ALJ in *Bird*, this ALJ

failed to give retroactive consideration to those portions of Dr. Walker's examination and opinion that were reflective of a possible earlier and progressive degeneration of Plaintiff's impairment. Dr. Walker examined Plaintiff in August 2012, diagnosed severe tophaceous gout, and indicated Plaintiff had significant restrictions that had persisted since 2001. Tr. at 399–400. Dr. Walker's opinion was supported by Plaintiff's testimony that he moved to South Carolina in 2002 because his physical problems prevented him from performing his job duties, his earnings record that showed no income after 2001, and his alleged onset date of October 1, 2006. *See* Tr. at 37, 50, 185. Dr. Walker's opinion was further corroborated by Plaintiff's history of treatment for gout and objective medical findings prior to Plaintiff's DLI. Plaintiff was treated for bilateral elbow pain and diagnosed with gouty arthritis and epicondylitis on February 25, 2005. Tr. at 304. On May 6, 2005, Ms. Baril diagnosed chronic gouty arthritis after she observed Plaintiff to have an inflamed left big toe and tophaceous deposits on his bilateral elbows. Tr. at 303. Plaintiff was again diagnosed with gout after presenting to MUSC on January 3, 2006, with severe knee pain and swelling that had lasted for weeks. Tr. at 393. On December 6, 2006, Plaintiff complained of gout in his bilateral legs and difficulty walking. Tr. at 302. The provider diagnosed gouty arthritis after he observed Plaintiff to have "large deposits" in both elbows, inflammation in multiple joints, tenderness in his right great toe and ankle, severe tenderness in his bilateral elbows and knees, and 2–3+ edema in his knees, ankles, and feet. *Id.* The symptoms, diagnoses, and objective observations prior to Plaintiff's DLI were consistent with Dr. Walker's report, which implies a linkage between Plaintiff's condition at the time of Dr. Walker's examination and his pre-DLI

condition. Based on Fourth Circuit precedent, the ALJ erred in failing to give retroactive consideration to Dr. Walker's opinion.

The undersigned recommends a finding that the ALJ erred in failing to consult with a medical expert. Although the Commissioner argues that Plaintiff's onset date was not ambiguous because the ALJ provided evidence to support the date he assessed, the undersigned is not persuaded by this argument. In finding that Plaintiff became disabled on June 27, 2011, the ALJ ignored evidence to the contrary. Because there was evidence to support an earlier onset date, this was not one of the "most plain cases" mentioned in *Bailey*, and it necessitated the informed opinion of a medical consultant to determine Plaintiff's onset date. Therefore, based on the language of the Fourth Circuit in *Bailey* and the directives of SSR 83-20, the ALJ's failure to call upon the services of a medical advisor rendered his decision unsupported by substantial evidence.

### 2.    Credibility

Plaintiff argues that the ALJ did not properly evaluate his credibility. [ECF No. 20 at 26]. He maintains that the ALJ did not explain how the medical evidence and reported activities supported the credibility determination. *Id.* at 28. The Commissioner argues that the ALJ reasonably assessed Plaintiff's credibility and discussed his credibility finding. [ECF No. 22 at 14–15].

To assess a claimant's credibility, the ALJ must first determine whether the claimant's medical record shows "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. §

404.1529(b), 416.929(b). In *Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996), the court explained that "for pain to be found to be disabling, there must be shown a medically determinable impairment which could reasonably be expected to cause not just pain, or some pain, or pain of some kind or severity, but the pain the claimant alleges she suffers." The court further explained, "[t]he regulation thus requires at the threshold a showing by objective evidence of the existence of a medical impairment 'which could reasonably be expected to produce' the actual pain, in the amount and degree, alleged by the claimant." *Id. citing Jenkins v. Sullivan*, 906 F.2d 107, 108 (4th Cir. 1990) (explaining that 42 U.S.C. § 423(d)(5)(A) requires "objective medical evidence of some condition that could reasonably be expected to produce the pain alleged"); *Foster v. Heckler*, 780 F.2d 1125, 1129 (4th Cir. 1986).

"It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated. *Id.* at 595 citing 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1). This second step requires the ALJ to consider the record as a whole, including both objective and subjective evidence, and a claimant's "statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence." SSR 96-7p.

If an ALJ rejects a claimant's testimony about his pain or physical condition, he must explain the basis for such rejection to ensure that the decision is sufficiently

supported by substantial evidence. *Hatcher v. Sec'y, Dep't of Health & Human Servs.*, 898 F.2d 21, 23 (4th Cir. 1989). "The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p. In evaluating the intensity, persistence, and limiting effects of an individual's symptoms and the extent to which they limit an individual's ability to perform basic work activities, adjudicators are to consider all record evidence, which can include the following: the objective medical evidence; the individual's ADLs; the location, duration, frequency, and intensity of the individual's pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; any measures other than treatment the individual uses to relieve pain or other symptoms; and any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. *Id.*

The ALJ indicated the following credibility finding:

Thus, after careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause some level of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible prior to June 27, 2011, to the extent they are inconsistent with the residual functional capacity assessed.

Tr. at 19–20. The ALJ further explained that Plaintiff did not have the "level of treatment" or "any functional evidence" to indicate he was disabled prior to December 2006. Tr. at 20.

The undersigned recommends a finding that the ALJ failed to properly assess Plaintiff's credibility. The ALJ's statements regarding Plaintiff's credibility are ambiguous. By indicating the claimant's impairments "could reasonably be expected to cause *some level* of the alleged symptoms," the ALJ was unclear as to whether he found that Plaintiff's impairments could reasonably be expected to produce the symptoms Plaintiff alleged. On the one hand, the ALJ's statement suggests that he determined Plaintiff's impairment could not have reasonably been expected to produce all of or the degree of symptoms alleged. On the other hand, the ALJ briefly mentioned Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms, which is the second step in the credibility determination process and was unnecessary if the ALJ determined at the first step that the claimant's impairments could not have reasonably been expected to cause the pain the claimant alleged. Because the ALJ failed to clearly articulate the basis for his credibility determination, the undersigned is unable to find that it is supported by substantial evidence.

Furthermore, the ALJ neglected to cite substantial evidence to support either a determination that Plaintiff's impairments could not have reasonably been expected to produce his alleged symptoms or that his statements concerning the intensity, persistence, and limiting effects of his symptoms were not credible. The ALJ did not specify how the medical evidence failed to substantiate Plaintiff's allegations. He merely stated that the

records for the period prior to the DLI "do not establish a level of treatment, let alone any functional evidence, that could be considered disabling." *See* Tr. at 20. In reaching this conclusion, the ALJ ignored objective evidence and indications of functional limitations reflected in the record prior to and after Plaintiff's DLI. The ALJ also neglected to consider Plaintiff's statements and other evidence regarding his pain and its limiting effects. Therefore, the undersigned recommends a finding that the ALJ failed to adequately explain his credibility finding and support it with substantial evidence.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

*Shiva V. Hodges*

January 27, 2015                                    Shiva V. Hodges
Columbia, South Carolina                      United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).